A judgment similar to that of the trial court may be presented.

*Judgment accordingly.*

Ross, P. J., Hildebrant and Matthews, JJ., concur in the opinion and judgment.

Zivkoff, Admr., Appellant, *v.* The Pennsylvania Rd. Co., Appellee.

(No. 361—Decided December 7, 1948.)

*Messrs. Anderson, Will & O'Donnell,* for appellant.
*Messrs. Burt, Carson, Lynch & Miller,* for appellee.

PUTNAM, J.   Plaintiff's decedent was killed by defendant's train, while driving an automobile across the Spring street crossing in the village of Loudonville.   This action for wrongful death resulted.   At the close of plaintiff's testimony the court directed a verdict for the defendant.   This appeal on questions of law results.

The basis of the court's action was that, although the evidence showed the defendant guilty of negligence, it also showed the plaintiff's decedent was guilty of contributory negligence which was a proximate cause of his death.   The plaintiff claims that the evidence presented a jury question because of the facts peculiar to the case, together with the presumption of the use of ordinary care attaching to the actions of the decedent.   The defendant maintains that the case comes squarely within the principles announced in the cases of *Patton, Admx., v. Penna. Rd. Co.,* 136 Ohio St., 159, 24 N. E. (2d), 597, and *Lang, Admx., v. Penna. Rd. Co.,* 59 Ohio App., 345, 18 N. E. (2d), 271.   Inasmuch as the court's action in directing a verdict was confined to the proposition of contributory negligence, this review will be limited to that phase of the case.   The court stated that the evidence presented a jury question as to the negligence of the defendant as far as speed was concerned.   The court had previously sustained a demurrer to some twenty interrogatories of

the plaintiff going to this point and felt that this would have prejudiced the plaintiff had excessive speed not been shown otherwise.

Inasmuch as the defendant intimated in argument, although the contention was not stressed, that there was no evidence of defendant's negligence as to speed by reason of its claim that an ordinance of the village of Loudonville limiting the speed of trains, alleged in the petition and denied in the answer, was unreasonable and invalid, it is well to point out that the plaintiff also alleged negligence of the defendant in not having proper warning signs at this dangerous crossing in the closely built-up section of this village. The court excluded evidence of the dangerousness of this crossing and the company's knowledge of the same. In the case of *Woodworth, Admx.,* v. *New York Cent. Rd. Co.,* 149 Ohio St., 543, 80 N. E. (2d), 142, in the course of the opinion the court said:

"The law does not require railroad companies to place signals, gates or flashers at highway crossings unless ordered by the Public Utilities Commission, or unless such crossings are especially dangerous or there exist special circumstances which render such precautions necessary for the public safety. None of these exceptional conditions was shown. *Cleveland, C., C. & I. Ry. Co.* v. *Schneider,* 45 Ohio St., 678, 693, 17 N. E., 321."

In the light of the above we feel, therefore, that the pleadings and the evidence did or should have presented a jury question as to the negligence of the defendant.

The facts as shown by the evidence are substantially as follows. The railroad involved was the main line of the defendant's Pittsburgh and Fort Wayne and Chicago road. It is a double-track road with continual heavy traffic. The train was an eastbound fast pas-

senger train. Spring street intersects the tracks at not quite a right angle in a northwest-southeast direction. There are four tracks at the crossing, two main line and two sidetracks, one on the north side and one on the south side. The sidetrack on the south side angles away from the eastbound main track so at the east side of Spring street the distance between the sidetrack and the southeast bound main track is something less than 30 feet. Spring street is 60 feet wide. At the center of the street the distance would be considerably less. Approaching the tracks from the south Spring street has a pronounced upgrade. The south track is lower than the main track. Approaching from the south on Spring street the view to the west is cut off by a house, an embankment and trees until the south sidetrack is about reached, when at this point there is a view to the west of about 2,000 feet.

The accident happened after dark between eight and nine o'clock on April 4, 1945. The leaves on the trees were not out and a high wind was blowing but its direction was not shown. There was no watchman at the crossing, no gates, no lights of any kind or warning devices of any kind except a crossarm railroad sign on the east side of Spring street at the edge of the south main tracks and within the tree line. There was a street light about one block south on Spring street. There was no eyewitness to the accident. Plaintiff's decedent, a young man 18 years of age, lived in Mansfield some 20 miles away. There was no evidence that he was familiar with this crossing. On the night in question he was last seen on Main street in Loudonville coming out of a restaurant with two ice-cream cones. He got into his car in which was his girl friend, a 16 year old high-school girl. He drove west on Main street and turned north

into Spring street. A Mrs. Hughes who lived on the west side of Spring street, two houses from the crossing, testified she was in her living room to the front of the house and heard the train and then a crash. She ran up to the crossing where she met a Mrs. Darling and her daughter, who lived north of the tracks. She and the Darlings were the first on the scene. The Darlings did not testify. She looked for an automobile but all she found was a hubcap. The body of the decedent's girl companion was found some distance east of the crossing between the east and westbound tracks, dead and badly mangled. The train stopped with its engine about North Adams street, some 2,500 feet east of Spring street. The automobile with decedent's body therein was on the front of the engine.

These are the essential facts except for a claim made by the plaintiff in support of his position that there may have been an engine on the south sidetrack to the west of the Spring street crossing at the time of the accident which obscured the decedent's vision. We will consider this first. This is based upon the testimony of one Max Peoples, the undertaker. He testified that sometime after the accident he saw an engine west of the crossing at Spring street but he did not know whether it was on the south sidetrack or the eastbound main track. Without going into details, a careful calculation from all his testimony shows that this could not have been less than 20 minutes after the accident. This could be of no probative value because there is no other testimony on this point and from this alone even if it would aid the plaintiff, to place the engine on the south sidetrack west of the crossing before the accident would require two inferences, one based upon the other—first, that the engine was on the south sidetrack, and, second, that its position was unchanged since before the accident. This is

not permitted and the jury could not have considered it for that purpose.

Consequently, we must approach the problem with the proposition that once the south sidetrack was nearly reached there was an unobstructed view to the west of at least 2,000 feet. The facts in the instant case are not the same as in the case of *Lang, Admx.,* v. *Penna Rd. Co., supra.* In that case there was direct testimony as to the actions of the decedent just prior to the accident. The value of that case is only as related to the weight to be given the pronouncements therein as to the presumptions attaching in this type of case. The facts of the case of *Patton, Admx.,* v. *Penna Rd. Co., supra,* are similar to those in the case at bar but with some important differences. In the *Patton case,* the driver was thoroughly familiar with the crossing; here there was no evidence that he was. In that case there were warning devices; here there were none. There is also a substantial difference in the view of the driver approaching a crossing.

As stated in the *Patton case,* there arises in cases of this kind a presumption that as decedent came to this crossing he was in the exercise of due care for his own safety. There is also a presumption as far as the defendant is concerned, that the headlight of its train was burning, its bell was ringing and its whistle had blown at the proper place. It is further recognized that the presumption of due care on the part of the plaintiff's decedent may be counterbalanced or rebutted by circumstances surrounding the accident. There is a difference of opinion as to when and whether these circumstances counterbalance the presumption and become a question of fact for the jury or a question of law for the court. The recognized criterion of course is whether reasonable minds could come to different conclusions on the proposition. That is the

crux of this appeal, but it is complicated by the decision reached in the case of *Betras, Admr.*, v. *G. M. McKelvey Co.*, 148 Ohio St., 523, 76 N. E. (2d), 280. As we read the opinion, not the syllabus, it seems to hold that not only the question of contributory negligence of the plaintiff but also the question of that negligence being a proximate cause is to be judged by the above criterion of reasonable minds and that while reasonable minds might or might not differ as to the contributory negligence phase, they might arrive at a different conclusion on the proximate cause phase. However, the minority of the court seemed to go further in its interpretation of the far-reachingness of the pronouncement of the court. Judge Hart, speaking for the dissenting minority, said in part:

"If in every personal injury case in which the contributory negligence of the plaintiff is made a defense the question as to whether such contributory negligence is a proximate cause of plaintiff's injury must be one for the jury, then in no such case may the trial court direct a verdict for the defendant on the ground of the contributory negligence of the plaintiff even though, as here, it be contributory negligence as a matter of law. I cannot concur in a rule which renders a trial court so impotent in the exercise of its functions or the discharge of its duties.

"Heretofore, under similar circumstances this court has approved directed verdicts and judgments for defendants notwithstanding the verdict, on the theory that, in those instances, both negligence and proximate cause under undisputed facts presented only questions of law." (Citing many cases including the *Patton case, supra.*)

Whether the majority of the court would put the same interpretation on the case is open to question. Again that case was a street accident case involving

a pedestrian and a motor vehicle in which the motor vehicle was governed by various statutory regulations by reason of which the injured party would be entitled to place some reliance thereon as effecting proximate cause. In crossing accident cases, however, involving steam railroads, it has long been recognized that the traveler must stop for the train and not the train for the traveler. Consequently, we shall decide this appeal upon the legal proposition that before a court can direct a verdict for the defendant by reason of the contributory negligence of the plaintiff, it must determine as a matter of law not only that the plaintiff was negligent but that that negligence contributed as a proximate cause to his own injury and recognize the principle that the determination of the one does not necessarily involve a like determination of the other.

In giving the plaintiff's evidence its most favorable construction and indulging all proper presumptions in his favor, all of which we are bound to do, we are faced with the following facts:

(1) The plaintiff's decedent in going north on Spring street in the exercise of ordinary care might be unaware that he was approaching a railroad crossing or that a train was approaching until he came upon, or very close to, the south sidetrack. This is so because (a) he was not familiar with this crossing, (b) due to the upgrade on Spring street and the different levels of the tracks his lights might overshoot them, (c) proper lights might not necessarily show the crossarm railroad sign on the east side of Spring street at the tree line, (d) until that point was reached the view to the west was obscured by the embankment, a house and trees and (e) the high wind may have made hearing difficult.

(2) Decedent was approaching the crossing at the

legal limit of 25 miles per hour and at this rate he would be traveling at the speed of 37 feet per second.

(3) The decedent was traveling just to the right of the center line of the street.

(4) The distance between the south sidetrack and the main eastbound track at the center of Spring street was about 20 feet, because (a) at the extreme east side of Spring street, the only testimony was that the distance was something less than 30 feet, (b) this sidetrack angled considerably to the southeast from the main track, and (c) Spring street is 60 feet wide.

(5) The train was approaching at 70 miles per hour with headlight burning, bell ringing and whistle had blown at proper whistling post, because (a) 70 miles per hour is alleged in the petition and the circumstances surrounding the collision would warrant a deduction of that speed, and (b) in the absence of testimony to the contrary presumptions in this type of case would cover the conclusion above stated as to headlight, etc., as they were legal requirements.

(6) At 70 miles per hour the train would be traveling at about 100 feet per second. This is a mathematical calculation.

Now it is a known fact, furnished to every automobile driver when he gets his driver's license, that the reaction time of a normal person between sensory perception and muscular action is between three-fourths and one second depending upon conditions. It is also a known fact that an automobile traveling at 25 miles per hour, equipped with normal brakes, has a breaking distance of 52 feet on the level, which on this upgrade on Spring street would be reduced somewhat and might be to the extent of 40 or 45 feet. Adding the reaction time to the breaking distance and giving the plaintiff's decedent the most favorable presumption of traveling just to the right of the center of the street at the legal

rate of 25 miles per hour, the time interval between the decedent's awareness of danger and his ability to stop short of the eastbound track would be two and one-fourth to two and one-half seconds, which at 25 miles per hour would be 83 to 92 feet. This would place his automobile 60 to 70 feet south of the south sidetrack at a time when he might first have been able to stop his car short of the main rtack. There is no evidence in the record from which a more probable inference could be drawn that he could have seen the train from this point. In fact the evidence is to the contrary. The chief of police testified that one must get "pretty close" to the sidetrack before he has an unobstructed view to the west. At that time the train would have been about 250 feet from the crossing. Could or should the decedent have seen it from that point?

It is true that the above facts as to the reaction time and breaking distance are not in the record but in view of human experience and mathematical calculation can a court say as a matter of law that the contrary is true?

It may be argued that even if the view was obscured, decedent should have heard the roar of the train, the whistle and bell. Perhaps so, but can we say so as a matter of law? With no awareness of danger, the location of these tracks, a high wind blowing, the interpretation of sounds, their distance or direction, becomes a matter of speculation. There is a difference in the standard which must be applied when we determine what is ordinary care to the actions and reactions of one approaching a railroad crossing who is familiar with that crossing and a stranger who is unfamiliar therewith.

In the first case having an awareness of approaching a dangerous railroad crossing one should be

looking and listening for certain things and have his mind set to interpret those sights and sounds and sensations which are indications of danger. In the latter case the awareness of danger being absent until that fact is suddenly impinged upon his consciousness, his reaction time in co-ordinating and interpreting the evidence of his senses is greater.

In the great majority of crossing accident cases which this court is familiar with, when a directed verdict has been upheld, either the plaintiff was thoroughly familiar with the crossing, or it was adequately protected by a watchman, or by lights and sound devices, or it was daylight or in plain view, or there were eyewitnesses to the conduct of the injured party. We have none of these conditions here. The decedent was a stranger to the crossing. There were no eyewitnesses to the collision. The crossing was a dangerous crossing. It was not at all protected either by a watchman or by gates or by lights or by sound devices. Was it in plain view? Should the decedent have seen it within the legal range of his headlights? Perhaps, but from the evidence in this case we cannot say so as a matter of law. There was an upgrade, the first track leveled off, the main tracks were higher. We know from common experience as we approach the top of a hill at night, the headlights of an automobile shoot upward and not downward. It could well be that on this grade none of these tracks was visible even to one using ordinary care.

From all the above considerations we are impelled to the conclusion that giving the evidence its most favorable construction in favor of the decedent and with the presumption involved, a jury question was presented.

The judgment must be and is reversed and the cause

is remanded to the court below for further proceedings in accordance with law.

*Judgment reversed.*

MONTGOMERY and McCLINTOCK, JJ., concur.